<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| JOHN A. ELDER, III, | : | Civ. No. 04-5285 (GEB) |
| Plaintiff, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, et al., | : | |
| Defendants. | : | |
| | : | |
| MIRIAM ZAWADZKI, | : | Civ. No. 03-6112 (GEB) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, et al., | : | |
| Defendants. | : | |

This matter comes before the Court upon Defendants' motion seeking summary judgment pursuant to Federal Rules of Civil Procedure Rule 56 in each of the above cases. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. The Court, having considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rules of Civil Procedure Rule 78, and for the reasons set forth below, will: (1) consolidate the above-captioned cases; and (2) grant Defendants' motion for summary judgment in all respects.

I.      **BACKGROUND**

    A.      **The Parties**

Plaintiffs John A. Elder, III, and Miriam Zawadzki ("Plaintiffs") were employees at the Social Security Administration ("SSA") during the time of the alleged incidents giving rise to these two actions. Mr. Elder served as manager of a teleservice center ("TSC") located in East Brunswick, New Jersey. (Elder Dep. 8, Feb. 24, 2005.) In that role, Mr. Elder was the top

management official assigned to the East Brunswick TSC, and his primary responsibility was to oversee the office's handling of telephone inquiries received on the SSA's 800 number network. (*Id.* 9.)  Mr. Elder was located primarily in the East Brunswick TSC until September 2001, and again from March 2002 to March 2004.  (Elder Dep. 40-41, Oct. 25, 2005.)  He worked at other TSC locations during the other periods.  (*Id.*)

Ms. Zawadzki served as a telephone service representative (TSR) in the East Brunswick TSC.  (Zawadzki Dep. 19-21, Feb. 23, 2005.)  Her responsibilities included responding to telephone inquiries from callers using the SSA's 800 number network.  (*Id.*)  Ms. Zawadzki's first-line supervisor was defendant Eleanor Balaban, a TSC supervisor, and her second-line supervisor was defendant Paula Eisengrein, an assistant manager at the East Brunswick TSC. (*Id.* 20-21.)  Ms. Zawadzki's third-line supervisor was Mr. Elder.  (*Id.* 21.)  Defendants Mary Kloby-Sherman ("Ms. Kloby") and David Howe also worked at the East Brunswick TSC.  Ms. Kloby served as a TSR supervisor and Mr. Howe served as a management support specialist. (Kloby Dep. 9-10, June 14, 2005; Howe Dep. 8, Aug. 23, 2005.)  Defendant Kathleen Downes served as a TSR and sat in the cubicle next to Ms. Zawadzki's during the relevant periods until approximately September 2001.  (Downes Aff. 1, May 28, 2002.)  Defendant Jo Anne Barnhart is being sued in her capacity as Commissioner of the SSA.  (Elder Compl. ¶10; Zawadzki Compl. ¶10.)

## B.    Mr. McDevitt's Alleged Offensive Comment

The events leading to Plaintiffs' lawsuit began in or around June 2000, when Ms. Zawadzki conducted a training session for employees at the Jersey City TSC.  (Zawadzki Dep. 135.)  Ms. Zawadzki claims that after the training, she had a conversation with Mr. McDevitt, the TSC director for the New York region, in which he commented "you should see the prostitution that go[es] on here."  (*Id.* 137; McDevitt Dep. 9, Aug. 11, 2005.)  Ms. Zawadzki claims that she

interpreted the comment literally and found it to be inappropriate and vulgar.  (Zawadzki Dep. 141-42.)

Upset by Mr. McDevitt's alleged comment, Ms. Zawadzki discussed the issue with Ms. Balaban and Mr. Elder separately.  Ms. Balaban discouraged her from writing a letter complaining of the incident, which she argued would make Ms. Zawadzki appear to be a disgruntled employee.  (Balaban Dep. 49-51, June 14, 2005.)  Ms. Zawadzki also met with Mr. Elder between approximately three to six times to discuss the issue.  (Elder Dep. 63-64, Feb. 24, 2005; Zawadzki Dep. 153-54.)  During those meetings, Mr. Elder urged her not to resign, which she was considering as a result of Mr. McDevitt's alleged comment.  (Elder Dep. 63-64, Feb. 24, 2005.)  It appears from the record that neither Ms. Zawadzki nor the managers with whom she spoke about the matter discussed it with Mr. McDevitt.  (*Id.* 62; McDevitt Dep. 50-51.)  The Court notes that Ms. Zawadzki's lawsuit is not based on Mr. McDevitt's alleged comment, but the events that subsequently occurred.  (Zawadzki Compl. ¶¶45-46, 50.)

### C.    Employee Complaints to Management and Union Representatives Concerning Mr. Elder's Alleged Relationship With Ms. Zawadzki

During that time, in or about June 2000, a number of employees began complaining that Mr. Elder and Ms. Zawadzki were engaging in an inappropriate personal relationship, and that as a result, Mr. Elder was giving Ms. Zawadzki preferential treatment.  Those complaints arose in part because of the amount of time that they spent meeting to discuss Mr. McDevitt's alleged comment.  For example, Colleen Connon, a union representative at the East Brunswick TSC, received a number of complaints from various employees that the two were spending too much time with each other.  (Connon Dep. 9-10, Aug. 23, 2005.)  According to Ms. Connon, morale in the East Brunswick TSC suffered as a result of the employees' perceptions of Plaintiffs' relationship.  (*Id.* 28.)  She told Mr. Elder about the problem, and suggested that he reduce his contact with Ms. Zawadzki.  (*Id.* 16.)  Ms. Connon informed Ms. Kloby, her manager, about the complaints, and Ms. Kloby further discussed the matter with Mr. Elder.  (Kloby Dep. 19-20;

Elder Dep. 47, Feb. 24, 2005.)  After receiving additional complaints from employees, Ms.

Kloby discussed the issue again with him approximately two weeks later.  (Kloby Dep. 22-23.)

Ms. Eisengrein learned about the problem in July 2000, during a conversation with

Denise Hachicho, the manager of the Jersey City TSC.  (Eisengrein Dep. 58, Aug. 2, 2005.)  Ms.

Hachicho informed Ms. Eisengrein that, at an upcoming meeting between the union and

management, the union planned to discuss the favoritism that Mr. Elder was allegedly showing to

Ms. Zawadzki.  (*Id.*)  In addition to hearing the news from Ms. Hachicho, Ms. Eisengrein was

later independently approached by Ms. Connon about the complaints concerning Mr. Elder and

Ms. Zawadzki.  (*Id.* 57.)

In August 2000, during the union-management meeting, the union brought up the general

topic of employees receiving preferential treatment in the assignment of training opportunities,

but did not discuss Mr. Elder and Ms. Zawadzki specifically.  (*Id.* 60-63.)  At the meeting,

however, the union president told Mr. McDevitt about the rumors concerning Mr. Elder's alleged

relationship with Ms. Zawadzki and the possibility that he was giving her preferential treatment.

(McDevitt Dep. 21.)  After the meeting, Mr. McDevitt heard additional complaints from

managers in the East Brunswick TSC, including Ms. Eisengrein.  (*Id.* 31-32.)  She informed Mr.

McDevitt that Plaintiffs were spending long periods of time in Mr. Elder's office, walking

together outside the office, taking lunch breaks together in excess of the permitted time and

taking breaks together in excess of the permitted time.  (*Id.*)


     **D.**     **Management's Response to Plaintiffs' Alleged Relationship**

          **1.**     **Discussions With Plaintiffs**

Various managers responded to the employee complaints by discussing the problem with

Mr. Elder personally.  In or about June 2000, Ms. Kloby discussed the matter at least twice with

Mr. Elder – first after learning about the complaints from Ms. Connon, and again after she

received a subsequent complaint about the same issue.  (Kloby Dep. 19-20, 22-23.)  Also in or

about June 2000, Ms. Balaban discussed the matter with Mr. Elder.  (Balaban Dep. 86.)  She

informed him that some employees believed that he was spending too much time with Ms.

Zawadzki, and that as a manager, he should be concerned about his employees' perceptions,

regardless of their accuracy.  (*Id.* 89-90.)  She also talked with Ms. Zawadzki about the problem,

telling her that it was unwise to continue spending time with Mr. Elder because employees were

talking about their relationship.  (*Id.* 74.)  Despite these conversations, Ms. Balaban continued to

receive complaints concerning Plaintiffs' alleged relationship.  (Balaban Aff. 3, May 30, 2002.)

In July 2000, Ms. Connon also discussed the problem with Mr. Elder.  (Elder Dep. 73,

Feb. 24, 2005.)  She told him that the office was "buzzing" with rumors about his alleged

relationship with Ms. Zawadzki.  (*Id.* 75-76.)  Ms. Connon was concerned that, as a result of

their alleged relationship, Ms. Zawadzki was not performing her job as well as the other TSRs.

(Connon Dep. 16-18.)  Following his conversation with Ms. Connon, Mr. Elder continued to

spend time with Ms. Zawadzki during the workday by taking walks outside the office building.

(Elder Dep. 70-71, Feb. 24, 2005.)  He believed that spending time outside of the office would

help dispel the rumors.  (*Id.* 71.)  Mr. Elder also informed Ms. Zawadzki that people were talking

about their spending time together.  (*Id.*)

Mr. McDevitt, after learning about the rumors at the union-management meeting, also

talked with Mr. Elder about Ms. Zawadzki.  In August 2000, the two met to discuss the

complaints that he had received about Mr. Elder's alleged preferential treatment towards Ms.

Zawadzki.  (Elder Dep. 81-82, Feb. 24, 2005.)  Mr. McDevitt instructed Mr. Elder to take

employees' perceptions into account in his actions and to make sure that his relationship with

Ms. Zawadzki would not be misinterpreted.  (*Id.* 85, 90; McDevitt Dep. 34.)  Mr. Elder

responded by saying that his meetings with Ms. Zawadzki had been for business purposes, and

that the allegations of preferential treatment were not true.  (Elder Dep. 88, Feb. 24, 2005.)

In or about August 2000, Ms. Eisengrein learned that Mr. Elder had approved a request

by Ms. Zawadzki to work part-time.  (Eisengrein Dep. 87-88.)  Mr. Elder approved the request

without first discussing the matter with either Ms. Eisengrein or Ms. Balaban. (*Id.*) Unhappy about the matter, Ms. Eisengrein told Mr. Elder that she and Ms. Balaban should have been consulted prior to the approval because they were in Ms. Zawadzki's chain of command. (*Id.*)

### 2.    The Managers' Meeting to Address Plaintiffs' Alleged Relationship

In response to the continued complaints concerning Plaintiffs' alleged relationship, Ms. Eisengrein held a meeting in early September 2000 to discuss the problem with the management staff. (*Id.* 126.) Defendants Ms. Balaban, Ms. Kloby and Mr. Howe attended that meeting. (*Id.* 127.) At the meeting, Ms. Eisengrein told the participants to refrain from talking about the issue with employees and to discourage them from gossiping about Plaintiffs' alleged relationship. (*Id.* 127-28.)

Despite management's efforts to quell the rumors, employee complaints continued. In November 2000, Mr. McDevitt again spoke with Mr. Elder about the rumors. (Elder Dep. 105-06, Oct. 25, 2005.) He told Mr. Elder that employees continued to complain about his alleged relationship with Ms. Zawadzki, and reminded him again that, as manager, he should consider employees' perceptions of his conduct. (*Id.*) Mr. Elder said that he was trying to be careful about the matter by not meeting with Ms. Zawadzki in his office anymore and by not taking walks with her outside. (Elder Dep. 93, Feb. 24, 2005.)

### 3.    The Human Resources Audit

In or about December 2000, Mr. McDevitt requested that the regional office conduct a human resources audit of the East Brunswick TSC. (McDevitt Dep. 74-76.) He did so out of concern that Mr. Elder's conduct with Ms. Zawadzki continued to provoke suspicions among employees. (*Id.*) The audit was conducted on January 22 and 23, 2001. (Malenzi Dep. 24, Aug. 11, 2005.) It consisted, among other things, of interviews of all of the management staff and approximately two-thirds of the office's employees. (Audit Report at 2, May 22, 2001.)

A primary purpose of the audit was to determine whether Mr. Elder's alleged relationship with Ms. Zawadzki created a hostile work environment for others in the office. (Malenzi Dep. 21.) Employees were not asked directly about that topic, but were instead asked whether there were any incidents of inappropriate behavior in the office. (*Id.* 33-34.) Bernadette Malenzi, the head of the audit team, conducted about seventy percent of the interviews. (*Id.* 34-35.) Of those, approximately two-thirds responded that they believed that Mr. Elder and Ms. Zawadzki were having an affair. (*Id.* 35.) Based on her team's audit, Ms. Malenzi determined that rumors of the affair began in May 2000, and that by July 2000 most of the employees in the office believed that Plaintiffs were having an affair. (*Id.* 43.) She further determined that Plaintiffs' conduct did not create a hostile work environment, except potentially with respect to one employee who sat near Ms. Zawadzki and would overhear her conversations with Mr. Elder. (Audit Report at 6.)

On September 10, 2001, Mr. McDevitt assigned Mr. Elder to the Jersey City TSC for a temporary assignment. (McDevitt Dep. 105-06.) Mr. McDevitt has stated that one reason for the assignment was to give the staff "a little time out" from the rumors about Plaintiffs. (*Id.*)

### E.    Plaintiffs' EEO Complaints

On or about October 26, 2001, Ms. Zawadzki met with an EEO counselor to complain that she was being sexually discriminated against and subjected to a hostile work environment. (Zawadzki Dep. Ex. D-3.) Her complaint was based on allegations that certain of the defendants were spreading – and permitting the spread of – rumors that she was having an affair with Mr. Elder. (*Id.*) The SSA subsequently investigated Ms. Zawadzki's complaint, and in August 2003, the administrative judge found that Ms. Zawadzki failed to establish a prima facie case of sexual harassment. (Ruymann Aff. Ex. 39 at 2-3.) In September 2003, the SSA issued a final order adopting the administrative judge's decision. (Ruymann Aff. Ex. 40.)

In or about November 2001, Mr. Elder also filed an EEO complaint. He claimed that he had been discriminated against because of his age and sex, and that he was being subjected to a

hostile work environment.  (Ruymann Aff. Ex. 41 at 2-3, 5.)  Like Ms. Zawadzki, Mr. Elder

based his claim primarily on allegations that certain of the defendants facilitated the spread of

rumors about their relationship.  (*Id.* 2-3.)  The SSA investigated Mr. Elder's complaint and, in

the course of that investigation, Mr. Howe submitted an affidavit stating that he saw Mr. Elder

"pleasuring himself" in his office.  (Howe Aff. 2, Oct. 11, 2002.)  Mr. Elder now claims that Mr.

Howe's statement also was an act of unlawful discrimination.  On August 2, 2004, the SSA

found that the East Brunswick management staff had legitimate and nondiscriminatory reasons

for their actions, and that Mr. Elder failed to prove that he had been discriminated against.

(Ruymann Aff. Ex. 52 at 9.)


#### F.     Procedural History

Ms. Zawadzki filed her complaint in the above-captioned case on December 23, 2003.

She asserts three claims against Defendants:  (1) sex-based discrimination based on a hostile

work environment; (2) sex-based discrimination based on unlawful retaliation; and (3)

defamation.  (Zawadzki Compl. ¶¶44-46, 49, 53-54.)

Mr. Elder filed the complaint in his action on October 28, 2004.  He asserts two claims

against Defendants:  (1) sex-based discrimination based on a hostile work environment; and (2)

sex-based discrimination based on unlawful retaliation.  (Elder Compl. ¶¶36-38, 42.)

On February 24, 2006, Defendants moved for summary judgment of the sexual

discrimination claims in both Mr. Elder and Ms. Zawadzki's cases.  The Court will now address

Defendants' motion with respect to both cases.


## II.     DISCUSSION

#### A.     Consolidation of Plaintiffs' Separate Actions

Federal Rules of Civil Procedure Rule 42(a) provides that "[w]hen actions involving a

common question of law or fact are pending before the court, it may order a joint hearing or trial

of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." Fed. R. Civ. P. 42(a). Here, the lawsuits brought by Plaintiffs concern common questions of fact, namely, Defendants' allegedly discriminatory conduct and their reasons for that conduct. The two cases also involve common questions of law regarding the elements of Plaintiffs' discrimination claims. For these reasons, consolidation of these cases pursuant to Rule 42(a) is appropriate.

### B.      Standard of Review for Motion for Summary Judgment

Summary judgment should be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987). The court must award summary judgment on all properly supported issues identified by the moving party, except those for which the non-moving party has provided evidence to show that a question of material fact remains. *See Celotex*, 477 U.S. at 324. In arguing against a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### C.        Requirements for Employment Discrimination Claims

Plaintiffs claim that Defendants unlawfully discriminated against them by:  (1) creating a discriminatory hostile work environment; and (2) retaliating against them for certain lawful complaints that they made.  The Court will address Defendants' motion with respect to each of Plaintiffs' claims.

### 1.        Sex-Based Hostile Work Environment

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1).  The statute permits individuals to bring claims where they are forced "to work in a discriminatorily hostile or abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  "The statutory basis for these claims is the notion that discriminatory ridicule or abuse can so infect a workplace that it alters the terms or conditions of the plaintiff's employment."  *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006).

To succeed on a claim based on a hostile work environment, a plaintiff must prove that: (1) the employee suffered intentional discrimination because of his sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) respondeat superior liability exists.  *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) (citations omitted); *Kunin v. Sears Roebuck and Co.*, 175 F.3d 289, 293 (3d Cir. 1999); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1304 n.19 (3d Cir. 1997) (citations omitted).

The plaintiff must also show that the harassment "[is] so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment."  *Weston*, 251 F.3d at 426.  *See also Harris*, 510 U.S. at 21 ("[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview").

Factors that the court should consider include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Jensen*, 435 F.3d at 451 (citing *Harris*, 510 U.S. at 23). "Title VII is not 'a general civility code for the American workplace.'" *Jensen*, 435 F.3d at 449 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998)). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted). *See also Robinson*, 120 F.3d at 1297 ("not every insult, slight, or unpleasantness gives rise to a valid Title VII claim").

### a.      Mr. Elder's Hostile Work Environment Claim

Mr. Elder claims that "Defendants . . . created a hostile work environment based on sex, by promulgating, encouraging and spreading false information to other management officials that [he] was and is involved in an adulterous affair with [Ms. Zawadzki]" and "failed to take any remedial steps to address or stop the false accusations concerning the alleged affair." (Elder Compl. ¶¶37-38.) He further claims that "[a]s a result of this unlawful discrimination, [he] was adversely affected in the terms and conditions of his employment, by creating an unbearably hostile working environment . . . ." (*Id.* ¶39.)

Mr. Elder's hostile work environment claim fails as a matter of law because the undisputed record shows that he would fail to satisfy at least three elements. First, there was no intentional discrimination against Mr. Elder based on his sex. The record shows that, in response to employee complaints about his alleged relationship with Ms. Zawadzki, Defendants took various steps to alleviate the harm that the rumored relationship was causing in the office. Several of the defendants met to discuss the problem among themselves, separately discussed the issue with Mr. Elder and addressed the rumors during conversations with employees. All those

actions, however, pertained to Mr. Elder as a manager – they had nothing to do with his being a man.  Mr. Elder concedes as much – in both his complaint and papers in opposition to Defendants' motion for summary judgment, he fails to explain how any of Defendants' alleged conduct occurred because of his sex.

Second, the type of conduct that Mr. Elder alleges would not support a Title VII claim. He claims that Defendants contributed to – and failed to stop – rumors that he and Ms. Zawadzki were having an affair.  Mr. Elder also argues that Mr. Howe's allegations that he was "pleasuring himself" in his office contributed to a hostile environment.  Drawing all reasonable inferences in Mr. Elder's favor, even if Defendants helped to spread rumors about Plaintiffs, and even if Mr. Howe's allegation was false, the alleged conduct is not enough to support Mr. Elder's claim.  The rumors concerning Plaintiffs' alleged relationship were not physically threatening or humiliating, and were consistent with behavior that a number of employees observed.  (*See e.g.* Audit Report at 5 (finding that several employees said that Plaintiffs were "spending inordinate amounts of time" together).)  There is no evidence showing that Defendants' participation in the rumors was frequent or severe, if Defendants participated at all.  As for Mr. Howe's statement, it was an isolated example of an especially lewd allegation – there were no other rumors of a similar character.  There is no evidence that Mr. Elder's work performance was impaired by any of the rumors.  Unpleasant and untrue as they might have been, without more, these rumors would not be enough to make a work environment hostile.  *See Faragher*, 524 U.S. at 788 ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal quotations omitted); *Robinson*, 120 F.3d at 1297 ("not every insult, slight, or unpleasantness gives rise to a valid Title VII claim").

Third, the conduct that Mr. Elder alleges would not detrimentally affect a reasonable person of the same sex in his employment position.  Mr. Elder was a manager who, by his own admission, had an overtly friendly relationship with Ms. Zawadzki, an employee under his

management.  Regardless of what that relationship entailed, the record shows that a significant number of employees believed it to be inappropriate.  (*See e.g.* Malenzi Dep. 34-35 (showing that approximately two-thirds of the employees that the head of the audit team surveyed believed that Mr. Elder and Ms. Zawadzki were having an affair).)  Several managers spoke with Mr. Elder personally to discuss that relationship and the problems that it was creating in the office.  In several of those conversations, Mr. Elder was reminded that, as manager, he should consider employees' perceptions of his conduct, regardless of the accuracy of those perceptions.  The problem persisted, and Mr. Elder eventually moved to the Jersey City TSC for a temporary assignment, in part to give the staff "a little time out" from the rumors about Plaintiffs.  (McDevitt Dep. 105-06.)  Based on these facts, and drawing all reasonable inferences in favor of Mr. Elder, discussions by Defendants that Plaintiffs were engaging in inappropriate behavior would not detrimentally affect a reasonable person in his position as manager.

The same is true with respect to Mr. Howe's statement.  It was a single allegation that did not result in any official reprimand or receive continuing publicity.  A reasonable person in Mr. Elder's management position would not be detrimentally affected by such an isolated and inconsequential comment.  *Robinson*, 120 F.3d at 1297.

### b.    Ms. Zawadzki's Hostile Work Environment Claim

Ms. Zawadzki also claims that "Defendants . . . created a hostile work environment based on sex, by promulgating, encouraging and spreading false information to other management officials that [she] was and is involved in an adulterous affair with [Mr. Elder]" and by "fail[ing] to take any remedial steps to address or stop the false accusations concerning the alleged affair."  (Zawadzki Compl. ¶¶45-46.)

For the same reasons as with Mr. Elder's claim, Ms. Zawadzki's claim would also fail.  First, Defendants' alleged conduct relates to her as an employee with a potentially inappropriate relationship with a manager – it had nothing to do with her being a woman.  For example,

13

although Ms. Zawadzki filed a number of grievances concerning various actions by management, none were based on allegations of sexual discrimination.  (Zawadzki Dep. 52, 58, 62-63.) Second, her claim is based on the same alleged spreading of rumors as Mr. Elder's claim, and that conduct is not prohibited by Title VII.  Finally, a reasonable person in her position would not have been detrimentally affected by the alleged conduct.  The managers sought to restrict a potentially inappropriate relationship between an employee and her manager, one that was prompting continued and serious discord in the office.  Such conduct by Defendants would be expected by a reasonable person in Ms. Zawadzki's position.

### 2.     Unlawful Retaliation

To succeed on a Title VII disparate treatment claim, a plaintiff must follow the burden-shifting requirements set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (framework applies to retaliation cases).  Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination.  *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000).  If the plaintiff succeeds in doing so, the defendant has the burden to provide a legitimate, nondiscriminatory reason for its action.  *Id.* at 319.  If the employer satisfies its burden, the plaintiff must then demonstrate that the proffered reason was merely a pretext for unlawful discrimination.  *Id.*

To establish a prima facie claim of retaliation, a plaintiff must show that:  (1) he engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the employee's protected activity and the employee's adverse action.  *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001).  "[R]etaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment . . . [to] constitute 'adverse employment action.'"  *Robinson*, 120 F.3d at 1300

(citations omitted).  *See also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("[a]
tangible employment action constitutes a significant change in employment status, such as hiring,
firing, failing to promote, reassignment with significantly different responsibilities, or a decision
causing a significant change in benefits"); *Jensen*, 435 F.3d at 448 ("[r]etaliatory conduct other
than discharge or refusal to rehire violates Title VII when it alters the employee's compensation,
terms, conditions, or privileges of employment, deprives him or her of employment
opportunities, or adversely affect[s] his [or her] status as an employee") (internal quotations
omitted).

### a.    Mr. Elder's Retaliation Claim

Mr. Elder claims that "after he complained about the Defendants' discrimination . . .
Defendants attempted to ruin [his] reputation by promulgating, encouraging and spreading false
information to other management officials [about his alleged relationship with Ms. Zawadzki], []
making false and outrageous statements that [he] had engaged in lewd and sexually explicit
behavior in the SSA office, and failing to take any remedial steps to address or stop this unlawful
discrimination and retaliation."  (Elder Compl. ¶42.)  He further claims that "[a]s a result of this
unlawful retaliation, [he] was adversely affected in the terms and conditions of his employment,
by creating an unbearably hostile working environment . . . [and] has also been overlooked for
promotions and bonuses for which he was qualified."  (*Id.* ¶43.)

Mr. Elder's retaliation claim fails, however, because the conduct that he alleges in his
complaint does not constitute adverse employment actions.  Mr. Elder claims that Defendants
promulgated rumors about his alleged relationship with Ms. Zawadzki, but the type of office
gossip that he alleges is not "serious and tangible enough to alter [his] compensation, terms,
conditions, or privileges of employment . . . ."  *Robinson*, 120 F.3d at 1300.

The only conduct that Mr. Elder could arguably claim constituted an adverse employment
action is that Defendants "overlooked [him] for promotions and bonuses for which he was

qualified." (Elder Compl. ¶43.)  He claims that Defendants retaliated against him by denying him performance bonuses for his assignment to the Jersey City TSC.  (Elder Dep. 88-89, Oct. 25, 2005.)  But Defendants had a legitimate and nondiscriminatory reason for their actions.  Mr. McDevitt assigned him to the Jersey City TSC in part to give the staff "a little time out" from the rumors about Plaintiffs.  (McDevitt Dep. 106.)  The remedial nature of the assignment justified the alleged denial of a "performance award[]."  (Elder Dep. 88, Oct. 25, 2005.)

Defendants also had legitimate and nondiscriminatory reasons for any discussions that they may have engaged in concerning Plaintiffs' alleged relationship.  Defendants discussed the matter, not to promulgate rumors, but to quell them.  Various employees had approached the managers and union representatives to express their discomfort with Mr. Elder and Ms. Zawadzki's alleged relationship.  The human resources audit showed that a large portion of the surveyed employees believed that Plaintiffs were having an affair.  The problem was serious enough that the managers met to discuss how to address it.  Several managers spoke individually with Mr. Elder to express their concerns and ask him to help remedy the situation.  Mr. Elder himself acknowledged that his conduct towards Ms. Zawadzki could have been misconstrued, and that he took steps to avoid further misconceptions.  (Elder Dep. 72-74, 93, Feb. 24, 2005.)  Any discussions by Defendants about Plaintiffs' alleged relationship, either among themselves or with their employees, were for the legitimate and nondiscriminatory purpose of improving the welfare of their office.

Mr. Howe also had a legitimate and nondiscriminatory reason for stating that he witnessed Mr. Elder pleasuring himself.  He provided the statement in the course of the SSA's investigation of Mr. Elder's EEO complaint, which concerned the details of Mr. Elder's personal affairs in the office.  (Howe Aff. 1, Oct. 11, 2002.)  Mr. Howe stated what he believed he saw, even if it was questionable whether the act in fact occurred.  (Howe Dep. 75-77, Aug. 23, 2005.)  The alleged conduct, if it happened, would have been inappropriate office behavior.  Mr. Howe

provided his statement for the legitimate and nondiscriminatory reason of reporting prohibited behavior, and therefore does not support Mr. Elder's claim.

> **b.     Ms. Zawadzki's Retaliation Claim**

Ms. Zawadzki claims that "Defendants . . . retaliated against [her] after she complained about the inappropriate sex based comments of a management official." (Zawadzki Compl. ¶50.) She further claims that "[t]hrough this retaliation, Defendants attempted to ruin [her] reputation by promulgating, encouraging and spreading false information to other management officials that [she] was and is involved in an adulterous affair with [Mr. Elder], while failing to take any remedial steps to address or stop the false accusations concerning the alleged affair." (*Id.*)

Ms. Zawadzki's retaliation claim is based largely on the same conduct by Defendants as Mr. Elder's claim, and fails for the same reasons. First, the alleged actions do not constitute adverse employment actions sufficient to support a discrimination claim. Second, the record shows that Defendants discussed Mr. Elder and Ms. Zawadzki's alleged relationship for the legitimate and nondiscriminatory purpose of responding to employee complaints. Defendants are therefore also entitled to summary judgment with respect to Ms. Zawadzki's retaliation claim.

## III.     CONCLUSION

For the above reasons, the above-captioned cases are consolidated, and Defendants' motion for summary judgment is granted. An appropriate form of order is filed herewith.

Dated:  June 26, 2006

>       s/ Garrett E. Brown, Jr.
> GARRETT E. BROWN, JR., U.S.D.J.